17 So.2d 713

**ELAM v. SHUSHAN.**

No. 37113.

March 13, 1944.

Rehearing Denied April 17, 1944.

J. L. Warren Woodville, of New Orleans, for appellant.

Walter F. Marcus and Bert Flanders, Jr., both of New Orleans, for appellee.

O'NIELL, Chief Justice.

The plaintiff is appealing from a judgment rejecting his demand for the value of

services rendered as a civil engineer. The amount claimed is $4,000.

There was no contract between the parties, either written or verbal. The plaintiff is relying upon articles 2292, 2293 and 2294 of the Civil Code, dealing with obligations arising without an agreement between the parties, and defining quasi contracts as voluntary acts from which obligations result without any previous agreement that they should result.

The defendant's plea, on which the judge rejected the plaintiff's demand, is that the services were rendered gratuitously, in appreciation for favors which the defendant had granted the plaintiff, and with the hope of receiving future favors, and that there was an agreement or understanding between them at the time when the plaintiff commenced the work that there would be no charge for his services.

The only question is whether there was such an understanding at the commencement of the work. On that issue the burden of proof was on the defendant, because there is no dispute that the services were rendered, nor doubt about their value. In the words of Justice Slidell, in Camfrancq v. Pilie, 1 La.Ann. 197, 198,

"It is true, as urged by the defendants, that gratitude for benefits received, or the hope of future favors, is a sufficient foundation for a contract; and that gratuitous contracts are expressly recognized in our law. But it must be remembered, on the other hand, that, according to the elevated morality of the civil law, no one ought to enrich himself at the expense of another; and that, where a party calls upon another to do a thing, the law, in the absence of contrary proof, supposes an obligation to pay for what is done. For actions without words, either written or spoken, are presumptive evidence of a contract, when they are done under circumstances that naturally imply a consent to such contract."

The events which gave rise to this controversy commenced in the fall of 1936, when the defendant bought a large tract of land—nearly 350 acres—near Covington, in St. Tammany Parish, intending to convert the place into a magnificent estate and to build upon it a handsome residence for himself and his family. He was formerly chairman of the Orleans Levee Board and was proprietor of a large wholesale business in New Orleans. Elam was then superintendent of the New Orleans Airport at a salary of $350 per month, and resided at the airport, which was under the control and administration of the Levee Board. Shushan also resided in New Orleans, and he and Elam were close friends. It was through the influence of Shushan that Elam became superintendent of the airport. Elam was a civil engineer of recognized ability and high standing, having obtained his degree from Tulane University in 1924. When Shushan bought the land in St. Tammany Parish he telephoned to Elam requesting him to go with him and look over the property, with the view, as we understand, of obtaining Elam's advice about Shushan's plan to convert the place into a beautiful estate. Elam testified that in the telephone conversation Shushan said that he wanted Elam to design and supervise the construction of a swimming

pool on the place, like one that Elam had designed and of which he had supervised the construction at the airport. Shushan denied that he made any such request of Elam, and in his testimony insisted that his talk on the telephone went no further than to invite Elam to go with him and look over the place which he had bought. After Elam had inspected the premises, he, at the request of Shushan, designed and supervised the construction of a fireproof fence completely enclosing the land, and costing approximately $10,000. Elam then made a topographic map of the estate, describing in detail its physical features, especially the elevations and depressions, and the proposed location of a series of lakes, and the proposed location of all of the improvements to be constructed on the land. Elam afterwards designed and made plans of several artificial lakes and of waterfalls by which the artesian water would flow from lake to lake and ultimately into the Tchefuncta River. He designed and supervised the construction of a swimming pool, and several picturesque bridges spanning the lakes; and he designed and supervised the construction of an elaborate gateway for the main entrance to the estate,—the construction of which gateway cost $3,000. The total cost of all of the constructions which Elam designed and supervised was $97,500; besides which the residence and surrounding buildings, of which he planned only the locations, cost about $80,000. His services continued for a period exceeding two years, from the fall of 1936 to the spring or early summer of 1939. During that period Elam made frequent visits to Shushan's estate, especially at week ends.

Elam's services to Shushan came to an end before the constructions which were contemplated were completed. The reason for that was that certain conditions of vast public importance in the affairs of the state came to light, and had the effect of dimming Shushan's enthusiasm and of beclouding his landscape. As Elam explained, Shushan's interest in the work and the work itself then petered out.

During all of the time when Elam was rendering the services, for the value of which he is now suing, and for nearly two years afterwards, he made no claim for compensation for his services.

The correctness of the judgment in this case does not depend upon the veracity of either of the parties to the suit. Shushan's testimony might be disregarded altogether in maintaining his defense, because there are several admitted facts which, taken in connection with a letter which Elam wrote to Shushan at the parting of the way, are convincing that Shushan's obligation to Elam at the end of the work was nothing more than an imperfect obligation. That kind of obligation, as defined in article 1757 of the Civil Code, "operates only on the moral sense, without being enforced by any positive law, * * * and creates no right of action, nor has it any legal operation." The example given in that article of the Code is this: "The duty of exercising gratitude, * * * and the other merely moral duties, is an example of this kind of obligation."

The admitted facts and circumstances which we refer to as sustaining Shushan's

defense are these: During the progress of Elam's work he presented Shushan with bills for expenses incurred, from time to time, and Shushan paid the bills promptly. They consisted principally of small items, such as gasoline used in Elam's automobile for traveling to and from the Shushan estate, and the bridge tolls incurred in that way. Elam admitted in his testimony that Shushan paid all of such bills that he, Elam, presented. Shushan paid also for the services of two draftsmen employed by Elam to assist in making the plans which he furnished. Elam admitted that if he had been working under a contract for compensation for his services as a civil engineer he would have charged a fee or commission sufficient to warrant his paying the expenses—and that he would have paid them—as the work progressed. On or about the 5th of October 1940, more than a year after Elam performed the last of his services to Shushan, Elam borrowed $150 from Shushan, and paid the loan without any suggestion that it should be charged against any amount which Shushan might owe Elam for his services. Elam paid the loan before he and Shushan ever discussed the matter of compensation for Elam's services. During the progress of the work Elam borrowed $2,000 from the Whitney National Bank in New Orleans, on two promissory notes for $1,000 each, endorsed by Shushan as an accommodation to Elam. Elam paid one of the notes and reduced the other to $700 without informing Shushan that he intended to charge for the services he had rendered. In the early part of April 1941 —on or before the 9th of April—Shushan invited Elam to Shushan's office in his place of business in New Orleans and insisted that Elam should pay the balance of $700 due to the Whitney National Bank. Shushan was then contemplating going to another state, where he would be detained for a considerable time—possibly two and a half years,—although in fact he was detained there only ten months. In the conversation in Shushan's office or place of business, on or before the 9th of April 1941, Shushan insisted that Elam should pay the balance of $700 to the Whitney National Bank before he, Shushan, would have to leave the state. Elam testified that in the conversation he told Shushan "in a casual way I thought it was about time we got together on what I thought he owed me". In his testimony Elam admitted that when he made that statement to Shushan, it struck the latter with astonishment that Elam should think that Shushan owed him anything. Elam repeated in his testimony that the reaction which he got from Shushan was that he did not think he owed Elam anything. And Elam added that when he got home that day and thought the matter over he became angry and wrote a letter to Shushan demanding payment for his services. Elam testified that he had not kept a copy of the letter but that he thought it was written in April 1939. His attorney then stated, in the trial of the case, that he had not seen the letter and had no knowledge of its having been written. The attorney for Shushan then produced the letter, and Elam, after examining it, admitted that it was the letter which he had referred to as being a demand for payment for his services and as having

been written in April 1939. He admitted that the letter was dated correctly, April 9, 1941, and that it was the first letter he had ever written to Shushan on the subject. The letter, dated April 9, 1941, and addressed to A. L. Shushan at his place of business in New Orleans, reads as follows:

"Dear Sir: The only way to prevent suit by the Whitney National Bank on the matter of the $700.00 balance due on the original $1,000 note, is for you to pay it, as I do not have the money.

"I believe this is little enough for you to do, in view of amount of work I did for you on the Covington job, and for part of the expenses I incurred in wearing out an automobile in running over to Covington three to four times a week for nearly a year."

That letter could not be construed as a demand for payment for the services which Elam had rendered to Shushan. On the contrary, the letter was nothing more nor less than a request that Shushan should pay the balance of $700 due on the note in reciprocation of the favors which Elam had rendered to Shushan in the improvement of his estate. Elam did not even claim in his letter that Shushan owed him as much as the $700 due on the note. On the contrary, Elam asked Shushan merely to pay the note as a favor,—on the principle that one good turn deserves another. And, in justification or excuse for the request, Elam declared that he was not financially able to pay the note; which was virtually the same as to say that he would pay it if he had the money. In the

second or concluding paragraph of this letter Elam virtually conceded that Shushan was only morally obligated to pay the $700, as a reciprocal favor for the favors which Elam had rendered, and to reimburse him for a part of the wear and tear on his automobile. The wearing out of the automobile was perhaps the only expense for which Shushan had not reimbursed Elam.

We consider it a matter of some significance that Elam, having failed to keep a copy of the letter which he wrote to Shushan on April 9, 1941, forgot that he had written such a letter until it was brought to his attention while he was testifying on the trial of the case. It is significant also that Elam's attorney was not aware that Elam had written such a letter when this suit was filed.

Our conclusion is that the judgment appealed from is correct.

The judgment is affirmed.