173 So.2d 382 (1965)
Gordon H. MARTIN, Plaintiff-Appellant,
v.
Mrs. Catherine Garrity BOZEMAN, Administratrix of Succession of Annie Garrity O'Reilly, Defendant-Appellee.
No. 6329.
Court of Appeal of Louisiana, First Circuit.
March 8, 1965.
*383 Joseph H. Simpson, of Schilling & Simpson, Amite, for appellant.
Harold J. Lamy, of Dodd, Hirsch, Barker & Meunier, New Orleans, for appellee.
Before ELLIS, LOTTINGER, LANDRY, REID and BAILES, JJ.
BAILES, Judge.
This is an action brought by plaintiff, Gordon H. Martin, against the administratrix of the Succession of Annie Garrity O'Reilly to recover the sum of $27,000 allegedly due plaintiff for services rendered to Annie Garrity O'Reilly, hereinafter called decedent, for a period of 30 years, commencing in 1933 and ending in 1963.
After trial, judgment was rendered in favor of plaintiff in the amount of $4630, together with legal interest thereon from date of judicial demand until paid, and for all costs. Plaintiff appealed. Defendant, in *384 answer to the appeal, contends that the award of the trial court is excessive and should be reduced to $1500.
The background facts are these. The plaintiff was married twice. The first time to Alice Scully, the niece of decedent. The first wife was reared by decedent from about age nine, her parents having died sometime prior thereto. The relationship between the niece and the decedent was a very close one, actually approximating that of mother and daughter. In fact, few persons knew the true relationship between them. In 1932, plaintiff and his first wife were married. Not many months thereafter decedent came to live with them, and she remained in the home and was treated in every respect as a member of the family until the plaintiff's first wife died.
In March, 1956, while his first wife was on her death bed in the hospital, and the decedent expressing to him her concern of what would happen to her after her niece died, plaintiff told decedent that she could continue to live with him, and that he would provide for her just as he had done in the past. In response to his offer, the decedent on this occasion, and on several occasions thereafter expressed her appreciation and told him that she would leave him what she had at her death. Although plaintiff did provide for her from March, 1956, until she left his home in 1961, when she died in 1963, plaintiff learned that she had not carried out her repeated promise to provide for him in her will.
The record is replete with proof that the plaintiff did continue to provide for decedent from the time his first wife died in March, 1956, until the decedent left plaintiff's home in 1961. After decedent left plaintiff's home, her mental condition gradually deteriorated to an extent that it became necessary in August, 1962, for her friends [not including plaintiff] to have her committed to the asylum at Jackson. She remained there as a patient until she died in April, 1963. Even after decedent was committed to the asylum at Jackson, plaintiff and his [second] wife made several trips to visit her there, and upon her death they made the necessary arrangements for her burial in accordance with the wishes she had expressed during her lifetime.
After plaintiff's first wife died, decedent and plaintiff resided together in plaintiff's home until plaintiff married his second wife in June, 1958. Upon this marriage, plaintiff moved to the home of his new wife where they resided until April, 1961. During these years, plaintiff maintained his own home for the exclusive use of decedent, and during this period of time he continued to provide for all her needs, requirements, pleasures and comforts, took her on pleasure trips, trips to New Orleans, to Rosaryville, about town where ever she wished to go, to the grocery store, post office, and any other place she desired or had need to go, and he administered constantly to her. In April, 1961, plaintiff and his wife decided to move into the plaintiff's home which had been occupied alone by decedent. This move was dictated by the economic situation of the plaintiff. In preparation of moving back, all of which had been fully discussed with decedent, plaintiff added an additional bedroom and bath to his home at a considerable cash outlay all in order to more comfortably accommodate the three of them, that is, decedent, plaintiff and his wife. After the improvements were completed and as plans finalized for the move to be made, decedent without any cause or reason removed herself from the home. At this time, plaintiff admonished decedent that he would no longer be responsible for her care, keep and welfare.
The trial judge denied recovery to plaintiff for any and all services rendered to decedent between 1933 and March, 1956, on the ground that it was a gratuity; allowed plaintiff partial recovery for the period of time from March 1956 to June, 1958, charging him, in effect with an offset for value of services rendered by decedent to plaintiff while they inhabited *385 together the plaintiff's home; and allowed recovery on strict proof of value of residence occupancy, food and utilities in the amount of $4630.
For convenience of consideration, the plaintiff's claim for restitution over this thirty year period is best divided into two periods: The first period will be that extending from 1933 to 1956, that is, the entire period of time during which decedent lived in the plaintiff's home during the lifetime of his first wife, Alice Scully; and the second period will be that running from March, 1956 to the date of decedent's death in 1963.
We note the following statement in the plaintiff's brief regarding these two periods:
"* * * Gordon Martin's claim against the estate before 1956 depends on the theory of unjust enrichment, which the trial judge mistakenly applied to the claim after 1956. His claim against the estate after 1956 depends on the theory of implied-in-fact contract, and recovery should be on a quantum meruit basis. * * *."
We will consider the case in the order of the plaintiff's assignment of errors.
Quoting further from his brief, the plaintiff says:
"The learned trial judge's first error was in not allowing recovery for the period 1933-1956. Gordon Martin should recover on the theory of unjust enrichment of the estate of decedent as outlined in the case of Succession of Dugas [215 La. 13], 39 So.2d 750. This is a Supreme Court case. The statement that is of particular interest regarding the Dugas case appears as a footnote in the case of Muse v. Muse [215 La. 238], 40 So.2d 21."
Counsel for the plaintiff, in oral argument, made a stirring plea that this court consider "unjust enrichment" as the controlling principle of law in this case, through the application of which his client should recover for the services which he rendered to the decedent during the twenty-three year period between 1933-1956. In order for us to consider the application of this theory or principle, we must first make some general observations.
From the plaintiff's argument [and as the court observes from a perusal of the record] there is no question of an express contract or a contract implied-in-fact between plaintiff and decedent for the payment of the rendition of services between 1933-1956. Thus by eliminating these types of contracts, we should consider the constructive or quasi-contract, or contract implied-in-law. As we view the plaintiff's case, and while plaintiff nowhere in his brief alludes to a quasi-contract, constructive contract or a contract implied-in-law, the doctrine of unjust enrichment can arise or find application only from such a legal involvement.
This doctrine is expressed in 17 C.J.S. Contracts § 6, page 566, as follows:
"Contracts implied-in-law, or, as stated supra § 4, more properly quasi or constructive contracts, are a class of obligations which are imposed or created by law without regard to the assent of the party bound, on the ground that they are dictated by reason and justice, and which are allowed to be enforced by an action ex contractu. They rest solely on a legal fiction and are not contract obligations at all in the true sense, for there is no agreement; but they are clothed with the semblance of contract for the purpose of the remedy, and the obligation arises not from consent, as in the case of true contracts, but from the law or natural equity. The courts employ the fiction of quasi or constructive contract with caution.
"Generally, quasi or constructive contracts rest on the equitable principle *386 that a person shall not be allowed to enrich himself unjustly at the expense of another, and on the principle that whatsoever it is certain that a man ought to do, the law supposes him to have promised to do. The obligation to do justice rests on all persons, and if one obtains money or property of others without authority, the law, independently of express contract, will compel restitution of compensation.
"In this respect, the terms `restitution' and `unjust enrichment' are modern designations for the older doctrine of quasi contracts, and the substance of an action for `unjust enrichment' lies in a promise, implied by law, that one will restore to the person entitled thereto that which in equity and good conscience belongs to him. Quasi-contractual obligations may be imposed despite, and frequently in frustration of, the intention of the parties, and no promise to repayment need be shown. * * *."
We do not believe the doctrine of unjust enrichment to be controlling of the period in question. Rather, we believe that the plaintiff's claim for recompense to be defeated by the facts contained in the record which leave no room for doubt that those benefits conferred on the decedent, in fact, were rendered gratuitously, without any idea, hope or thought of being remunerated therefor under any pretext, operation or consequence of law. We are supported in this position by the following testimony taken from the transcript:
Tr. Page 32, testimony of the plaintiff;
"Q. Up until the time she [meaning Mrs. Alice Scully Martin, wife of plaintiff] married you she had lived with Mrs. O'Reilly, had she not?
"A. That is right.
"Q. Do you know anything about your wife's upbringing to your marriage?
"A. Well, according to my wife, my wife's parents died when she was quite a small girl, and Mrs. O'Reilly was appointed her guardian. She lived with Mrs. O'Reilly in Covington where she went to school and Mrs. O'Reilly, from what I understood, she had received my first wife's and her brother's share of the family estate which was in New Orleans which amounted to quite a large sum of money.
"Q. And your wife lived with Mrs. O'Reilly and Mrs. O'Reilly raised her, is that correct?
"A. Well, she lived with Mrs. O'Reilly, yes, and I think she raised her with her own money.
"Q. It was generally regarded was it not in Hammond, that Mrs. O'Reilly was your first wife's mother, isn't that correct?
"A. That is correct.
"Q. People thought they were mother and daughter?
"A. Yes.
"Q. There was very little difference between their relationship and that of a mother and daughter, isn't that true?
"A. Very much similar, yes.
"Q. You indicated that at one point you left the house because you apparently had some friction with Mrs. O'Reilly, did you not?
"A. Not directly with Mrs. O'Reilly, I would say but Mrs. O'Reilly she did not come to me with anything, tell anything, she was continually, forever, keeping my wife upset and just anything and everything she could think of doing to agitate her, and my wife would come tell me about it, and still would not let me do anything *387 about it. When I would start to move Mrs. O'Reilly and make her get out she would come crying to me and ask me not to do so.
"Q. Your wife wanted Mrs. O'Reilly to stay there, that is a fair statement, is it not?
"A. Yes.
"Q. Now your wife worked throughout your marriage, did she not?
"A. That's right, with the exception of one long seizure of illness."
Tr. Page 34, testimony of plaintiff, continuing:
"Q. Did you keep her on [referring to keeping Mrs. O'Reilly on after the death of the first wife] because you expected her to leave you any large sum of money?
"A. At that time, no. I hadn't thought about it until she told me that she was going to leave me what she had."
Recovery through the application of the doctrine of unjust enrichment, which is based upon the concept that the person enriched must return to the person at whose instance he was enriched that which served to enrich him, is defeated and does not apply in the event the services, which would normally give rise to an obligation to pay, are rendered gratuitously. In the presence of a gratuitous intent on the part of the party performing the services, circumstances which would otherwise give rise to a quasi-contractual obligation to pay for the services rendered, give rise merely to an imperfect obligation (LSA-C.C. art. 1757) incapable of enforcement in a court of law. See: Elam v. Shushan, (1944) 205 La. 471, 17 So.2d 713; Stipp v. Doran, (1927) 3 Cir., 18 F.2d 83, at page 84, citing Elliot on Contracts, Vol. 1, § 18; Vol. 2, § 1355; Board of Highway Commissioners v. City of Bloomington, 253 Ill. 164, 97 N.E. 280, Ann.Cas. 1913A, 471; In Re Kellett Aircraft Corp., D.C., 94 F.Supp. 103, at page 109. In Tulane Law Review, Vol. 39, at page 62, the author makes the statement, without cited authority, that recovery will be allowed "* * * for any benefit voluntarily accepted unless conferred `animo donandi'." We accept this statement as expressive of the rule laid down in the Elam case and the rule which we accept as determinative of the appellant's inability to recover for those enrichments which may have been received by the decedent at appellant's expense during the period prior to the death of his [plaintiff's] first wife. We feel that these comments dispose of plaintiff's second specification of error.
The third error specified by appellant is that the trial judge was incorrect in stating that "in most cases where recovery has been allowed to the renderer against the recipient's estate, the services, expenditures, etc., have continued also uninterruptedly and more or less in the same degree to the date of the recipient's death." We do not find that this statement, whether it is or is not correct, actually influenced the decision of the trial court, and certainly has no bearing on the decision of this court. The same comment applies to the fourth assigned error that "in many cases, the services performed by the renderer were restrictive, burdensome, onerous, and almost destructive of private distraction and undertaking, requiring almost constant application by renderer to the needs of the recipient." We do not find that this could have influenced the trial judge, and certainly not this court, for the reason that actually the only personal services that are worthy of note flowing from appellant to decedent were the chauffeuring for her and the companionship and social attention he gave the decedent while she was a patient on two occasions in New Orleans hospitals.
The fifth error contended for by appellant is that the trial judge stated that during 1962-1963 when decedent was confined to the asylum in Jackson, that the items claimed by him are past the ending date of the second period of services. He *388 contends that he should be awarded an amount for trips to Jackson, for long distance telephone calls, etc.
We must agree with the trial court that no award is due appellant for these services. Appellant declared to decedent when she removed herself from his home in 1961, that if she did, in fact, leave his home his responsibility toward her was at an end. Whatever appellant did for the decedent must be considered as an act of human kindness and as a gratuity on his part.
In answer to appellant's assigned error number six, that the trial court erred in holding that the value of the personal services of the appellant and decedent for the period from March, 1956, to appellant's second marriage in 1958, were of equal value and offset each other, we find that the trial judge erred in holding that Mrs. O'Reilly rendered services and benefits to plaintiff equal in value to those rendered by plaintiff to her. It must be remembered and considered that Mrs. O'Reilly, at that time, was 75 to 78 years of age, and was not in any physical condition to help herself, much less be of any material or appreciable service to appellant. It should be borne in mind that appellant cared for Mrs. O'Reilly from the time of his first wife's death until Mrs. O'Reilly moved away from plaintiff in April, 1961, in the same manner and custom, and with the same attention and standard of living as she had been accustomed during his wife's lifetime.
The remaining errors specified by appellant have to do with the fixing of the value of the services rendered by appellant to decedent during the second period. The trial court granted its award based on the following computations: Groceries, $2170; Rent, $1860; Utilities, $600, totalling $4630.
Appellant's complaint is based on this statement found in the learned trial judge's opinion:
"The test of recovery is the extent which expenditures of this nature enrich the recipient even though the fair value of such may exceed the enrichment."
We agree with the appellant that an award based upon this measure of recompense would be erroneous; however, at another point in his opinion, the trial judge said:
"* * * he is entitled to recover from her estate the just and reasonable value of such services and support expenses."
A review of the record convinces us that the latter statement of the trial court is a correct statement of the principle to follow in fixing quantum.
In Succession of Berthelot, (1945) La.App., 24 So.2d 185, the court said:
"Where a person renders valuable services to another under the promise that these services will be rewarded after the death of the person to whom the services are rendered either in his will or out of his estate, the person rendering the services is entitled to recover from the succession of the person to whom the services were rendered the reasonable value of the services where there has been no specific amount agreed upon and no remuneration has been made for the services."
We find that there did exist between the appellant and decedent a contract implied-in-fact for payment of the services rendered, and it is due and will receive all the dignity of an express contract. The element missing and which renders the contract one implied-in-fact is that of payment which, of course, is implied, and the quantum is to be determined by the court. Appellant is entitled to be awarded an amount equal to the just and reasonable value of these services.
He contends that he is entitled to receive: Rent, $4095; groceries, $2650; utilities, $1200; miscellaneous, $1720; totalling $9665.
*389 From our consideration of the whole record, we believe the trial judge erred in his determination of quantum. We find that the record justifies an award of $150 per month for the sixty-two month period from March, 1956, to April, 1961. We believe this to be a fair, just and reasonable value of the services rendered by the appellant to decedent during this period of time.
Therefore, the judgment appealed from is amended by increasing the award to $9,300. Defendant to pay all costs.
Amended and affirmed.